**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDMUND MURPHY III, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JBS S.A.,<br><br>Defendant. | Case No.: 1:17-cv-03084-ILG-RER<br><br>Hon. Judge I. Leo Glasser<br><br>Hon. Magistrate Judge Ramon E. Reyes, Jr<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff GWI Enterprise Ltd. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Consolidated Class Action Complaint against Defendant, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by JBS S.A. ("JBS") as well as media and analyst reports about JBS.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal class action lawsuit on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded American Depositary Receipts ("ADRs") of JBS from June 1, 2013 through July 5, 2017, inclusive ("Class Period"), seeking to recover compensable damages caused by Defendant's violations of Securities Exchange

Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder. Excluded from the class are Defendant, Joesley Mendonça Batista ("Joesley"), former Chairman of JBS, Wesley Mendonça Batista ("Wesley") former Chief Executive Officer of JBS, current and former officers and directors of JBS, and each of their immediate family members, legal representatives, heirs, successors or assigns. Also excluded from the class are all of JBS's parents (including J&F Investimentos SA ("J&F Investimentos")), affiliates, subsidiaries, successors, predecessors, and any entity in which JBS or any of its current or former officers (including Joesley and Wesley), directors, or employees has or had, during the Class Period, a controlling interest. Plaintiff alleges herein that Defendant defrauded it and other similarly situated investors in JBS by making false and materially misleading statements about Defendant's adherence to JBS's compliance and anti-corruption polices.

2. Joesley and Wesley used to be the Chairman and Chief Executive Officer of JBS, respectively. JBS is an international conglomerate best known for being the largest meat processing company in the world. JBS is headquartered in São Paulo, but maintains operations across the globe. In addition to managing it, Joesley and Wesley also owned 42% of JBS through their wholly-owned holding company, J&F Investimentos.

3. Joesley and Wesley were sent to prison. The circumstances that led them there began in 2007 and continued for the following decade, involving widespread corruption and bribery at the highest levels of the Brazilian government. Recorded confessions, insider trading, and plea agreements are just a few of the high-profile events that landed the Batista brothers in prison. Investors in JBS have suffered the consequences as a result of their actions.

4. In 2007, JBS acquired Swift Foods Company ("Swift"), the third-largest U.S. processor of beef and pork, for $1.4 billion. With Swift's operations, JBS became the largest beef

company in the world. JBS paid for Swift in debt and cash with assistance from, among other entities, Brazil's National Bank for Economic and Social Development ("BNDES"). BNDES is a federal public company intended to provide financing for endeavors that contribute to Brazil's development. Unbeknownst to the public at the time JBS acquired Swift, JBS procured approximately $362 million from BNDES through fraudulent means, including bribes of more than $60 million paid by Joesley to Brazil's former Finance Minister Guido Mantega.

5. Joesley and Wesley continued to bribe Brazil's government officials over the course of the following decade. In March 2017, Brazilian federal police revealed the results of a two-year investigation named "Carne Fraca" (translated in English, "The Flesh is Weak"). The investigation revealed that numerous health officials had been accepting bribes from, among other meat processors, JBS. The scandal involved at least 40 incidents of bribery and resulted in federal police raids in almost 200 different locations. Federal police indicted 63 people for their role in the corruption scheme, including JBS employees. The bribes were made to health inspectors and politicians in exchange for product certifications, even when the meat was expired and rotten. Countries around the world immediately banned Brazilian meat imports. Brazil's government closed three plants and suspended the export licenses for 21 packing facilities.

6. In May 2017, the Brazilian newspaper *O Globo* reported that Joesley had secretly recorded Brazil's President, Michel Temer, endorsing the payment of "hush money" to Eduardo Cunha, the jailed former lower house speaker who was instrumental in the impeachment of Dilma Rousseff (President Temer's predecessor).

7. Shortly after *O Globo*'s report, Joesley and Wesley signed a Plea Deal deal with Brazilian authorities in exchange for reduced sentences (the "Plea Deal"). The Plea Deal encompassed testimony from Joesley and Wesley detailing that JBS paid President Temer $15

million reais (approximately $4 million) as well as significant amounts of money to other high-ranking Brazilian officials (by some reports, more than $192 million to approximately 1,900 politicians in total). The Plea Deal also called for a fine of 10.3 billion reais ($3.21 billion) over 25 years for corrupt acts committed by Joesley's and Wesley's companies. The Plea Deal allowed Joesley and Wesley to avoid criminal prosecution.

8. The Plea Deal, however, was to be made public. Upon its revelation, Joesley and Wesley knew that JBS's stock price would suffer a significant decline (and it did when, on May 18, 2017, JBS's stock price declined by 10% following reports of the Plea Deal). To avoid these losses, Joesley and Wesley (through a subsidiary of their holding company, J&F Investimentos) traded 329 million reais ($87.5 million) of JBS shares on inside information, namely that they were about to sign the Plea Deal. Joesley and Wesley saved $44 million by selling the JBS shares when they did, *i.e.*, just before entering the Plea Deal. They also placed vast trades on foreign exchange positions that allowed JBS to profit from a $2.8 billion bet against the Brazilian real. The Securities and Exchange Commission of Brazil noticed the insider trades in short order and, on June 9, 2017, raided JBS's office.

9. While the insider trading charges were more than enough to cause prosecutors to revoke Joesley's and Wesley's Plea Deal, additional accusations came to light that ensured its termination. In accordance with the Plea Deal, Joesley was required to provide Brazilian prosecutors with a recording of conversation between Joesley and President Temer. Joesley's lawyers, by mistake, sent Brazilian prosecutors a four-hour recording of a conversation between Joesley and Ricardo Saud, a former executive in the JBS-conglomerate family, in which Joesley and Mr. Saud discussed crimes that they had not confessed to in the course of negotiating the Plea Deal and had hid from prosecutors. In particular, during the conversation, Joesley admits to

procuring the Plea Deal by arranging a job for one of Brazil's prosecutors, Marcelo Miller, at the law firm used by JBS. The conversation also included Mr. Saud telling Joesley that Mr. Miller, was attempting to influence Brazil's chief prosecutor, Rodrigo Janot, on the terms of the Plea Deal.

10. The Plea Deal was revoked immediately. In September 2017, the Brazilian Supreme Court ordered the arrests of Joesley and Wesley. They were then sent to prison after coming into custody, where they remained for approximately six months. Wesley was released from prison and placed under house arrest in February 2018. Joesley was released from prison in March 2018, and also placed under house arrest.

11. Each confession, arrest, and report about Joesley's and Wesley's corruption resulted in a significant, material decline in the price of JBS's stock price. From an intra-Class Period high of $11.34 per share on May 20, 2015, the price of JBS's stock fell to $3.84 per share on July 6, 2017, the day after the end of the Class Period. JBS's investors have lost millions of dollars.

12. Plaintiff brings this action under the Exchange Act in an effort to recover its losses as well as the losses of other similarly situated investors. The Exchange Act, specifically Sections 10(b) and 20(a) [15 U.S.C. §§78j, 78t] and SEC Rule 10b-5 [17 C.F.R. 240.10b-5], prohibit companies and persons from making false and materially misleading statements in connection with the purchase or sale of any security. When investors, like Plaintiff here, purchase those securities in connection with those false and misleading statements, they are authorized to bring a private right of action to recover losses they sustained as a result.

13. During the ten-year period between JBS's acquisition of Swift and Joesley's and Wesley's incarceration, Defendant made numerous false and materially misleading statements about its adherence to JBS's compliance policies and codes of ethics. JBS repeatedly represented

that its employees complied with the company's *Manual of Ethical Conduct*, which prohibited corruption, insider trading, and other sensitive topics, as well as its *Material Information Disclosure Policy* and *Securities Trading Policy*, which as their names suggest relate to trading securities while in possession of inside information.

14. For example, in its annual report for 2013, dated May 16, 2014 (the "2013 Annual Report"), JBS told investors that it had "created a special working group" to "reword[]" the *Manual of Ethical Conduct* in order to comply with "Brazilian Law 12846/13" and to "reaffirm[] the commitment of the company and its employees to high ethical standards." JBS told investors further that, "JBS' Ethical Conduct Manual reinforces the company's corporate culture with the goal of guiding ethical behavior of employees and suppliers in daily negotiations. In this context, it addresses issues regarding breach, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, among other topics."

15. These statements, along with a number of others, created the false impression that compliance with the law and avoiding corruption were of high importance to JBS and its employees. In reality, however, Joesley and Wesley were actively engaged in a rampant streak of corruption and bribery. They had already bribed BNDES in connection with the acquisition of Swift and were in the midst of bribing President Temer and approximately 1,900 other high-ranking Brazilian officials. Joesley's and Wesley's corruption landed them in prison facing one of (if not the) largest fines in Brazilian history—$3.21 billion over the next quarter century. When Joesley and Wesley made and/or approved these statements in JBS's 2013 Annual Report, they did not honestly believe them and certainly omitted facts that conflicted with what a reasonable investor would understand from the statements themselves.

16. Defendant made these statements, and others like them, repeatedly in an effort to reassure the investing public about JBS's integrity. Reasonable investors, like Plaintiff, relied on these statements as reflective of the true state of affairs at JBS. And, when they purchased JBS's securities during the Class Period, they did so at artificially inflated prices. When the truth about Defendant's conduct emerged, JBS's stock price declined as the market discovered the true value of JBS. Plaintiff and other members of the Class suffered significant damages as their investments dropped in value. Defendant is liable for these losses.

## II. JURISDICTION AND VENUE

17. The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j, 78t] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

19. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

## III. PARTIES

21. Plaintiff purchased JBS's securities within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is incorporated by reference herein from its motion for appointment of lead plaintiff. Dkt. No. 7-3.

22. Defendant JBS, a food company, engages in the processing and trading of animal protein in Brazil and internationally. JBS was, at all relevant times, controlled by Joesley and Wesley through their ownership of J&F Investimentos. Defendant JBS was formerly known as Friboi Ltda. JBS was founded in 1953 and is headquartered in São Paulo, Brazil. JBS's Level 1 Sponsored ADRs trade on the OTCQX market (the "OTC Market") under the symbol "JBSAY."

23. Wesley was JBS's Chief Executive Officer from February 1, 2011 until resigning amidst the corruption scandal detailed herein on or about May 26, 2017.

24. Joesley was JBS's President and/or Chairman from at least 2007 until resigning amidst the corruption scandal detailed herein on or about May 26, 2017.

25. Because of Joesley's and Wesley's positions within JBS, they had access to undisclosed information about JBS's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including JBS's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

26. As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the U.S., Joesley and Wesley each had a duty to disseminate prompt, accurate and truthful information with respect to JBS's financial condition and performance, growth, operations, financial statements, business, markets,

management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of JBS's publicly-traded securities would be based upon truthful and accurate information. Wesley and Joesley were each provided with copies of JBS's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these individuals knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

27. Wesley and Joesley participated in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JBS securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JBS's business, operations, management and the intrinsic value of its ADRs and (ii) caused Plaintiff and other shareholders to purchase JBS securities at artificially inflated prices.

28. JBS is liable for the actions and scienter of Joesley and Wesley under the doctrine of *respondeat superior* and common law principles of agency.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

29. JBS is a global food industry leader with over 60 years' experience and 235 thousand employees worldwide.

30. JBS started a globalization process in 2005, with the acquisition of Swift Armour, in Argentina.

31. With an initial public offering in 2007, JBS became the first company in the beef industry to trade its shares in the Brazilian stock market. Also in 2007, JBS established itself as the world's largest company in the beef industry through the acquisition of Swift in the United States and Australia. With the new acquisition, JBS entered the pork market, ending the year as the third largest producer and processor of pork in the U.S. The acquisition increased JBS's portfolio to include the rights to the Swift brand in the world.

32. In 2009, JBS consolidated its protein production platform and diversified its activities. With the purchase of Pilgrim's Pride, JBS entered the chicken industry and, with the incorporation of Bertin Ltda., a Brazilian company, JBS joined the industry of dairy products, pet feed and biodiesel.

33. In 2012, JBS leased the Doux Frangosul's assets, becoming the world's largest chicken producer.

34. In 2013, JBS expanded its operations in the chicken segment in Brazil, through the rental of Tramonto Alimentos assets. In addition, JBS acquired the assets of XL Foods in the U.S. and in Canada, one of the ten largest beef producing nations and the sixth largest exporter. Recently, JBS acquired Seara, becoming the largest poultry processor in the world.

35. Since 2014, JBS' pork and poultry operations are operated by JBS Foods, which includes JBS Aves and Seara. Also in 2014, JBS acquired Primo SmallGoods Group, a leader in the Australian and New Zealand markets for processed products such as ham, sausages and bacon, and well-konwn brands in the case ready segment. In Brazil, JBS acquired the poultry business of Tyson Foods in Brazil and Tyson de Mexico.

36. In 2015, JBS acquired Moy Park, one of Europe's leading prepared food products and poultry producers, with 13 food processing and manufacturing units in the UK, France,

Holland and Ireland and over 13 thousand employees. Also in 2015, JBS also acquired Cargill's pork business in the US, the transaction added to JBS USA Pork two hog processing facilities, five feed mills, and four breeding units. With the acquisition, JBS became the second largest pork producer in the USA.

37. JBS' net revenue increased from R$4 billion in 2006 to R$170 billion in 2016. Currently, JBS operates production platforms and commercial offices in over 20 countries and has more than 400 production units, 230 of them strictly related to production of meat. JBS has capacity to process 80 thousand heads of cattle per day, more than 14 million birds per day, 115 thousand hogs per day and 100 thousand hides per day, serving over 300 thousand customers in more than 150 countries, being present in all 5 continents.

38. JBS is also active in other sectors related to its core business, such as leather, biodiesel, collagen, soaps, glycerin and natural casings and owns waste management, metal packaging and shipping businesses that support its global operations.

**B. Management Integrity**

39. Defendant consistently emphasized JBS' highest ethical standards in the management of its business. In fact, Defendant boasted about JBS' *Manual of Ethical Conduct*, a guide against corruption, money laundering, insider trading and other sensitive topics. Defendant also highlighted JBS' *Material Information Disclosure Policy* and JBS' *Securities Trading Policy*. These rules were ineffective and treated as mere boilerplate statements by the Defendant which engaged in one of the largest corruption schemes in the history of Latin America, in addition to using privileged information to trade securities in the public and OTC markets.

40. Defendant also touted JBS's fast expansion and financial success. However, as demonstrated hereon, JBS' exponential growth is the direct result of management's unlawful and unethical behavior.

### C. <u>The Corruption Schemes</u>

41. Joesley and Wesley paid bribes and facilitation fees to 1,829 people, including politicians and government officials, in exchange for illegal advantages that made up J&F Investimentos, the largest private group in Brazil, and JBS, the largest protein processor and the second largest food company in the world. The illegal advantages included tax benefits, expedited loans and investments from BNDES (including its investment arm), and the Brazilian federal bank Caixa Economica Federal ("CEF") (including its investment funds as well).

42. Joesley and Wesley also attempted to interfere with police investigations and decisions of the Conselho Administrativo de Defesa Econômica ("CADE"), the Brazilian Administrative Council for Economic Defense, as well as to appoint executives to the Comissão de Valores Mobiliários, the Brazilian Securities and Exchange Commission. They have also been accused of influencing the negotiations prior to and during the Plea Deal for Joesley and Wesley.

#### a. **The BNDES scheme**

43. The BNDES contributed more than R$8 billion reais to finance several of JBS' acquisitions, such as the purchase of Bertin and the U.S. companies Swift and Pilgrim's Pride. The acquisitions were responsible for JBS's exponential growth and jump in sales from R$4 billion reais to R$170 billion reais, between 2006 and 2016.

44. The Brazilian Audit Court ("TCU") is investigating these acquisitions, as JBS could not account for the funds invested in these operations. Additionally, the contributions were approved in an expedited manner well below the average for this type of operations. According to the Court, BNDES contributed approximately $362 million to the acquisition of Swift.[1]

[1] Tribunal de Contas da Uniao (T.C.U.) (Federal Court of Accounts), TC 034.930/2015-9, 04.26.2017 (Brazil).

45. Authorities believe that JBS orchestrated "kickbacks" of 4% of the value of each loan approved at the BNDES and 4% of the value of each financial contribution made through BNDES's investment arm, which were paid to facilitate the loans.

46. The payments were made in two phases. Between 2004 and 2008, a businessman acting on behalf of Defendant, Victor Sandri, was paid R$50,000 per month to facilitate negotiations between Joesley and the then-serving Minister of Planning, Guido Mantega.

47. In 2005, Mantega became president of the BNDES and the bank approved an $80 million loan to finance JBS's 2005 expansion plan. Four percent in kickback fees were deposited in an offshore account for the approval.

48. In 2007, after Mantega became the Finance Minister, BNDES acquired 12.94% of JBS shares for $580 million to finance 2007 expansion plans, including the acquisition of Swift.[2]

49. Starting in 2009, Joesley dealt directly with Mantega. That year, $50 million were deposited in an offshore account to benefit former Brazilian President Luis Inacio Lula da Silva. In exchange for the bribes, BNDES purchased $2 billion dollars in JBS debentures to finance JBS's 2009 expansion plans, including the acquisitions of Bertin and Pilgrim's Pride.

50. In 2010, $30 million were deposited in another offshore account to Dilma Rousseff, Lula's successor in the Brazilian presidency in exchange for the approval of a R$2 billion loan to finance the construction of Eldorado pulp mill in 2011.[3]

51. In 2014, the total balance of the foreign accounts was $150 million.

---

[2] Termo de Acordo de Colaboracao Premiada [Plea Bargain], Ministerio Publico Federal [Federal Prosecution Service, Sao Paulo], 05.03.17, 113 (Brazil).

[3] Plea Bargain, at 66.

b. **The PETROS and FUNCEF schemes**

52. Pension funds are entities that administer workers' supplementary retirement funds. Brazil's largest pension funds are linked to state-owned companies such as Petros (a pension fund from Petrobras) and Funcef (a pension fund from CEF). Joesley paid bribes to Petros and Funcef officials and to Partido dos Trabalhadores ("PT") (the Brazilian Workers' Party) in exchange for financial contributions from the funds.

53. The pension funds scheme was similar to BNDES's, except that kickback fees were also paid to the fund manager and to the treasurer of PT in the following arrangement: 1% to the president of the fund, 1% to the manager of the fund and 1% to PT, managed by João Vaccari, all deposited on Mantega's account.

54. In 2008, Joesley set up an operation that involved BNDES, FUNCEF, and PETROS acquiring 12.99% of JBS's stock for $1 billion to support the expansion plan of 2008 and 2009.[4] For this operation, BNDES, FUNCEF, and PETROS created a fund called "PROT" that would loan money to capitalize JBS. In exchange for the loan, a 1% facilitation fee was paid to political party PT and 1% facilitation fees to Guilherme Lacerda (president of FUNCEF), Joao Vaccari (PT manager), Vagner Pinheiro (president of PETROS) and his successors Luis Carlos Afonso and Carlos Costa.[5]

c. **The CEF and FI-FGTS schemes**

55. FI-FGTS is a fund managed by the CEF, which invests resources in infrastructure projects. In 2011, Joesley made payments of 3% to 3.5% of every loan approved to businessman Luciano Funaro ("Funaro") in exchange for influencing the approval of loans from FI-FGTS and CEF to J&F Investimentos and its portfolio companies, including JBS.[6]

---

[4] Plea Bargain, at 31.
[5] *Id. at* 70.
[6] *Id. at* 72.

56. Joesley negotiated payments with Funaro who worked on the scheme with Eduardo Cunha, president of the House of Representatives and responsible to appoint the vice president of FI-FGTS and other strategic positions at the CEF.

57. In 2012, approximately R$8 million were paid to Funaro. In 2014, R$50 million reais were paid as credit for future loans. Joesley also transferred to Funaro a helicopter owned by JBS as payment.[7]

58. In 2016, Joesley made payments to the president of political party PRB Marcos Pereira to guarantee he would maintain Antonio Carlos as vice president of CEF (a position appointed by the Political Party). Antonio Carlos was overseeing the approval of a R$2.7 million loan from CEF to JBS.

d. **The tax fraud schemes**

59. Defendant paid bribes to politicians from Brazilian States of Ceará, Mato Grosso, Mato Grosso do Sul and São Paulo to obtain discounts on ICMS [Brazilian State Tax on Goods and Services] payments and to release ICMS tax credits that JBS was owed by the State.

60. In 2003, in the beginning of "Zeca do PT's" (Worker's Party) administration, Joesley negotiated bribes worth 20% of any tax benefits granted to JBS by the state of Mato Grosso do Sul.

61. From 2007 to 2016, the bribe was adjusted to 30% and approximately R$150 million reais were paid to the governor of Mato Grosso do Sul Reinaldo Azambuja and former governors Zeca and André Puccinelli in exchange for tax benefits.[8]

---

[7] *Id. at* 37.
[8] Plea Bargain, at 63-68.

62. In 2010, Joesley paid R$5 million in bribery to the governor of Ceará Cid Gomes to release ICMS credits. R$1.5 million were paid in the form of official donations, and R$3.5 million through several fake invoices.[9]

63. In the State of Mato Grosso, the scheme started in 2011. Companies that did not fit into a tax incentive program, called ProDeic, would pay a 3.5% tax rate while those in ProDeic would pay between 0% and 1%.[10] Only a few of JBS' plants were in the tax incentive program while the others would have to pay the higher rate. As a temporary solution to remedy the tax distortion, the governor Silval Barbosa granted JBS a presumed credit of R$73.5 million for the year 2011 (equal to the difference in value paid in taxes for the plants not included in the program). Similar credits were offered to JBS in 2012 and 2013, and for each year a kickback fee of R$10 million reais was paid to the governor in cash and fake invoices, for a total of R$30 million.[11]

64. In 2014, Defendant JBS underwent an inspection that uncovered the irregularity on the R$73 million reais tax credits granted to JBS. Defendant JBS was fined R$200 million reais. To solve the issue, Wesley and the government officials signed a false document that retroactively extended the ProDeic benefit to all JBS plants. The document was signed in 2014 as if it had been signed in 2012.[12]

65. Also in 2014, Joesley paid R$20 million to finance the campaign of Camilo Sobreira as governor of the State of São Paulo in exchange for the release of R$110 million in tax credits that the State owed JBS.

66. In 2016, Joesley also paid approximately R$20 million reais in bribes to the then President of the House of Representatives Eduardo Cunha to facilitate approval of payroll tax

[9] *Id. at* 59-61.
[10] *Id. at* 56.
[11] Plea Bargain, at 56.
[12] *Id.*

deductions for the poultry sector.[13] The payroll relief was a measure implemented in 2011 by former Brazilian President Dilma Rousseff to stimulate the economy. The measure replaced the employer's social security contribution of 20% of JBS's payroll to a range of 1% to 2% of JBS's revenues. In 2015, the relief was renewed and the rates rose to a range of 2.5% to 4.5% of revenues, however, as a result of the bribery scheme, the meat sector was an exception and the rate was maintained at 1% of gross revenue.[14]

e. **Political donations**

67. With the intention to obtain goodwill and favors from political parties, Joesley regularly authorized payments on requests for money to politicians, whether during election campaigns or not.

68. The parties and political agents were included in a "goodwill reserve" and were paid through official donations, fake invoices or in cash. In some cases, the same party received payments linked to the negotiation of some official act, and other payments that were not.

69. In addition to cash payments and payments for fake invoices, JBS officially donated R$14.6 million reais to the PSB (Brazilian Socialist Party), R$4.3 million reais to the PSDB (Brazilian Social Democratic Party) and paid bribes to hundreds of politicians.[15] By October 2014, JBS had already officially invested over R$300 million reais in political campaigns.

70. Joesley also paid R$30 million reais to finance Cunha's campaign to run for Speaker of the House of Representatives and spent more than R$20 million reais in bribes to former Senator Aecio Neves.

---

[13] *Id. at* 38.
[14] *Id.*
[15] Plea Bargain, at 70-72.

71. In 2016, Joesley paid R$15 million reais to buy congressional votes in support of Brazilian former President Dilma during the presidential Impeachment procedure.[16]

**f. Attempt to influence CADE and CVM and tamper with police investigations**

72. Joesley asked Brazilian President Michel Temer and Rocha Loures, appointed as Temer's intermediary, to intercede in favor of J&F Investimentos in a lawsuit at CADE [the Brazilian Administrative Council for Economic Defense].

73. In the lawsuit, J&F Investimentos questioned Petrobras' monopoly on the import of gas from Bolivia. J&F Investimentos owns a gas-fired thermoelectric plant in Cuiabá, which ran out of raw materials to run because Petrobrás buys all Bolivian gas.

74. Joesley discussed with Temer and Loures having a "government-aligned president" at CADE. Loures explained that the solution of the case could generate gains of R$1 million to R$3 million reais per day for the group's thermoelectric plant. Joesley offered a facilitation fee of 5% of the thermoelectric profit if the issue was settled at CADE. The offer was accepted.

75. Joesley and Wesley also tried to tamper with police investigations regarding the investments in Eldorado. Joesley confessed paying R$4 million reais to Willer Tomaz, a lawyer friend of the assigned judge, and a bribery fee to assistant prosecutors to try to influence federal judge Ricardo Soares Leite, in charge of the investigation.

76. At the same meeting in which Joesley requested Temer's intervention at CADE, he also requested the appointment of "people aligned with the government" at the Brazilian Securities

**D. <u>Defendant's Corruption Is Revealed</u>**

77. On March 17, 2014, the Brazilian federal police launched *Operation Car Wash* to investigate crimes of active and passive corruption, fraudulent management, racketeering, money

[16] *Id. at* 88.

laundering, criminal organization, obstruction of justice, fraudulent money exchange and receipt of undue advantage. The operation uncovered the largest money laundering and corruption scheme in the history of Latin America implicating Brazilian Petroleum Corporation (Petrobras), high-level politicians and public figures in Brazil and 10 other countries. As a corollary of *Operation Car Wash*, the Brazilian federal police started several other investigations of corruption, in which Defendant was also implicated.

78. On September 7, 2015, *Operation Lama Asfáltica* was started, aiming at the disarticulation of a criminal organization specialized in diverting public resources between 2011 and 2014. JBS was investigated for paying bribes in exchange for tax benefits.[17]

79. On July 1, 2016, *Operation Sepsis* was launched in São Paulo, Rio de Janeiro, Pernambuco and Distrito Federal to investigate the FI-FGTS scheme. JBS was a target in the investigation.[18]

80. The same day, Joe Leahy, a reporter from the *Financial Times*, published an article entitled "Brazilian corruption probe spreads to meatpacker JBS." The article alerted investors that the Brazilian police raided Joesley's house under a new phase of *Operation Car Wash*.

81. On this news, ADRs of JBS fell $0.46 per share over the course of four trading days to close at $5.81 per share on July 5, 2016, damaging investors.

82. On September 5, 2016, *Operation Greenfield* was launched to investigate the pension funds scheme, responsible for approximately R$48 billion in deficits to the Brazilian pension funds FUNCEF, PETROS, PREVI and POSTALIS. JBS was investigated for paying bribes to FUNCEF and PETROS officials.[19]

---

[17] *Denúncia* [*Indictment*], Ministério Público Federal [Federal Prosecution Service, Sao Paulo], Docket nº 0006243-26.2017.403.6181, IPL 120/2017-1, 10.10.17, 4 (Brazil).
[18] *Id. at* 3.
[19] *Id.*

83. The same day, Leonardo Godoy, a reporter from *Reuters*, published an article entitled "JBS CEO Ordered to Step Aside in Brazil Pension Fund Probe." The article alerted investors that judicial authorities in Brazil had requested Wesley and Joesley to step away from any role at their companies following the commencement of investigation.

84. On this news, ADRs of JBS fell $0.80 per share or over 10.4%, over a course of three trading days, to close at $6.88 per share on September 6, 2016, damaging investors.

85. On January 13, 2017, *Operation Cui Buono* was launched to investigate the CEF scheme.[20]

86. The same day, Pedro Fonseca and Brad Hanynes, reporters from *Reuters* published an article entitled "Brazil Police Raid Offices in Probe of Caixa Loans". The article alerted investors that Brazilian federal police raided JBS' offices and its executives' homes in the investigation.

87. On this news, ADRs of JBS fell $0.12 per share or over 1.6%, from its previous price, to close at $7.38 per share on January 13, 2017, further damaging investors.

88. On March 17, 2017, *Operation Weak Flesh* was launched to investigate bribes JBS paid to regulators to subvert food inspections and overlook unsanitary practices, such as processing rotten meat and running plants with traces of salmonella.[21]

89. The same day, Brad Haynes and Sergio Spagnuolo, reporters from *Reuters*, published an article entitled "Brazil police raid BRF and JBS meat plants in bribery probe." The article alerted investors that JBS was under investigation for bribing food inspectors and regulators.

[20] Indictment, at 4.
[21] Indictment, at 4.

90. On this news, ADRs of JBS fell $0.71 per share or over 9.2% from its previous closing price to close at $6.96 per share on March 17, 2017, damaging investors.

91. On March 28, 2017, Joesley and Wesley signed a confidentiality agreement to preserve the secrecy of the Plea Deal being negotiated. Aware of the impact the Plea Deal would have on the market, Defendant and Joesley and Wesley used this privileged information to trade their own securities and also to negotiate currency derivatives, obtaining unfair advantage in the public securities markets.

92. Specifically, on March 31, 2017, Joesley authorized the sale of 42.2 million JBS shares (through FB Participações, the entity that held the JBS shares controlled by J&F Investimentos and, in turn, Joesley and Wesley) for approximately R$350 million. The decision came in anticipation of an unavoidable price drop in JBS's securities price once the existence of the Plea Deal was revealed to the public.[22]

93. On April 7, 2017, Joesley and Wesley signed a *Pre-Agreement to the Plea Deal* (the "Pre-Agreement").

94. From April 20, 2017 to April 27, 2017, FB Participações, under the management of Joesley, sold 26.1 million ADRs of JBS.[23]

95. From April 24, 2017 to April 27, 2017, Wesley authorized JBS to repurchase 19.3 million of JBS shares in the stock market.[24] These acquisitions absorbed part of the increase in the market volume during that time and contributed to the maintenance and even increase of JBS's share price.

[22] Temporary Arrest Request, at 4.
[23] *Id.* at 7-11.
[24] *Id.* at 7.

96. This market manipulation avoided Joesley and Wesley losses of approximately $44 million.[25]

97. On April 28, 2017, JBS started negotiating future dollar contracts and non-deliverable forward contracts with several financial institutions registered in the OTC markets.[26]

98. On May 3, 2017, Joesley and Wesley signed the Plea Deal providing JBS's executives the following benefits: (1) no indictment for all crimes confessed under the collaboration agreement; (2) immunity from all ongoing investigation; (3) judicial pardon from existing indictments in exchange for revealing the names and roles of the people involved in the corruption scheme in Brazil.

99. The Plea Deal could be rescinded in case of omission of information to the authorities, and yet Joesley and Wesley did not disclose the insider trading transactions during the Plea Deal.

100. On May 11, 2017, Brazilian authorities ratified the Plea Deal.

101. On May 12, 2017, *Operation Bullish* was launched to investigate the BNDES scheme, JBS loans received from BNDES, and investments received from BNDES's investment arm.[27]

102. The same day, Lisandra Paraguassu and Pedro Fonseca, reporters from *Reuters* published an article entitled "JBS shares drop as Brazil police probe loans to meatpacker." The article alerted investors of JBS' involvement in the BNDES scheme.

103. On this news, ADRs fell $0.28 per share or over 3.8% from its previous closing price to close at $6.96 per share on May 12, 2017, further damaging investors.

---

[25] *Id. at* 10.
[26] *Id. at* 12.
[27] Temporary Arrest Request, at 4.

104. On May 17, 2017, before the truth about the Plea Deal was revealed to the market, FB Participações sold and JBS repurchased additional 3.6 million shares of JBS. JBS also negotiated additional future dollar contracts and non-deliverable forwards for a total nominal purchase value of over $2.8 billion dollars.[28]

105. On May 17, 2017, during aftermarket hours, the truth about Defendant's participation in the corruption scandals and the signature of a Plea Deal were finally revealed. Brad Haynes, a reporter from *Reuters* published an article entitled: "JBS chairman taped Brazil president discussing hush money- O Globo". The article revealed that Joesley secretly recorded a conversation he had with the President Michel Temer about paying bribes to politicians. The article also revealed that the recording was offered to Brazilian prosecutors as part of a Plea Deal by Wesley and Joesley to avoid criminal prosecution for corruption.

106. On May 17, 2017, *Veja*, a Brazilian national magazine, published the following apology letter written by Joesley to the residents of Brazil:

> We made mistakes and we apologize.
>
> We did not honor our values when we had to interact, at different times, with the Brazilian Public Power. And we're not proud of that.
>
> Our entrepreneurial spirit and the immense willingness to perform, when faced with a Brazilian system that often creates difficulties to sell facilities, led us to opt for undue payments to public agents.
>
> Although we can explain what we have done, we can not justify it.
>
> In other countries outside Brazil, we were able to expand our business without violating ethical values.
>
> Thus we have built a business group that generates more than 270 thousand direct jobs, with extraordinary and competent teams that operate 300 factories on five continents and offer quality products worldwide.

[28] *Id. at* 5-12.

> Brazil has changed, and we have changed with it. That is why we are going beyond the apology. We assume here a Public Commitment of being intolerant and intransigent with corruption.
>
> We've signed agreements with the Prosecutor's office. We agreed to participate in some of the most incisive investigative mechanisms that have ever existed and we are at Justices disposal to expose, with clarity, the corruption of the structures of the Brazilian State.
> We apologize to all Brazilians and to all those who we disappointed, who believe in us and cheer for us.
>
> We will face this difficult moment with humility and we will overcome it by waking up early and working hard.

107. On this news, share of JBS fell $1.04 per share or over 16.9% from its previous closing price to close at $5.08 per share on May 18, 2017, further damaging investors.

108. On May 18, 2017, the confidentiality of the Plea Deal was lifted and the public had access to the confessions made by Joesley and Wesley in the lengthy Plea Deal (containing 41 annexes and 41 collaboration terms). In the Plea Deal, Joesley and Wesley narrated in detail the corruption and money laundering schemes they operated involving JBS and its parent company J&F Investimentos from 2003 to 2017.[29]

109. On May 19, 2017, Tatiana Bautzer and Alberto Alerigi, reporters from *Reuters*, published an article entitled: "Brazil watchdog opens new probes into JBS-related insider trading". The article revealed to investors that Brazilian authorities started a new investigation against JBS for insider trading not disclosed in the Plea Deal, breaking the agreement rules.

110. On this news, ADRs fell $1.68 per share or over 31% from its previous closing price to close at $3.68 per share on May 22, 2017, further damaging investors.

111. On June 5, 2017, as an extension of the Plea Deal, J&F Investimentos signed a "Leniency Agreement" with the Brazilian federal prosecutor's office agreeing to pay a fine of

---

[29] *Termo de Acordo de Colaboracao Premiada* [Plea Bargain], Ministerio Publico Federal [Federal Prosecution Service, Sao Paulo], 05.03.17 (Brazil).

R$10.3 billion reais in damages to governmental agencies for the role its controlled companies (including JBS) played in the Brazilian corruption scandals.[30] In exchange for paying the fine and collaborating with the government, J&F Investimentos and all controlled companies that joined the agreement received immunity from civil and administrative charges, including charges for administrative improbity. The Leniency Agreement could be rescinded if the Plea Deal was rescinded.

112. On July 5, 2017, the end of the Class Period, Brazil's Federal Court of Accounts (referred to previously as the TCU, which investigates and polices corruption) decided to include terms of Joesley's Plea Deal in proceedings against Defendant to recover losses sustained by the Brazilian treasury in connection with the Swift Acquisition.

113. On this news, ADRs of JBS fell from $4.21 per share on July 3, 2017 to $3.99 per share on July 5, 2017, and further to $3.84 per share on July 6, 2017, further damaging investors.

114. On September 4, 2017, Brazilian federal authorities ordered a review of the Plea Deal in light of new proof indicating that a federal agent was involved in a bribery scheme to facilitate the Plea Deal itself in addition to new proof of insider trading and market manipulation.[31]

115. On September 6, 2017, JBS announced to investors it signed a contract to join J&F Investimentos' Leniency Agreement.

116. On September 10, 2017, Joesley surrendered to the police after the Brazilian Supreme Court revoked his immunity under the Plea Deal for omitting information about the insider trading and market manipulation transactions in his Plea Deal.

[30] *Acordo de Leniência* [*Leniency Agreement*], Ministério Público Federal (Força Tarefa das Operações Greenfield, Sepsis e Cui Bono, Operacao Carne Fraca) [Federal Prosecution Service (Task Force for Operations Greenfield, Sepsis e Cui Bono, Operation Weak Flesh)], 06.05.17 (Brazil).
[31] *Procedimento de Revisão de Acordo de Colaboração* [*Procedure for Review of Plea Bargain*], Ministério Público Federal [Federal Prosecution Service], No 1011/2017/GTLJ-PGR, 09/04.2017 (Brazil).

117. On September 12, 2017, Brazilian federal authorities formally requested a Temporary Arrest Warrant against Wesley for insider trading and market manipulation.[32]

118. On September 13, 2017, Brazil's federal police arrested Wesley for insider trading and market manipulation.

119. On October 10, 2017, Joesley and Wesley were formally charged for insider trading and market manipulation and will face trial.[33]

120. On February 24, 2018, *Estadao*, a local Brazilian newspaper, revealed that JBS parent company J&F Investimentos is negotiating a new Leniency Agreement with the Brazilian federal prosecutors office to include immunity for the insider trading transactions not disclosed during the Plea Deal or the first Leniency Agreement.

121. In sum, Joesley and Wesley confessed to orchestrating a multi-year, multi-million dollar money-laundering and bribery scheme through which they bribed approximately 1,900 politicians and public officials in order to expedite the expansion of JBS's business in Brazil and international markets and illegally obtain loans, licenses, tax benefits, and other advantages for its operations. As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of JBS's ADRs, Plaintiff and other Class members have suffered significant losses and damages.

## E. Additional Details Concerning Wesley's and Joesley's Plea Deal

122. In the Plea Deal (annexes 19 to 24), Wesley confessed to paying bribes to public officials in order to obtain tax benefits and other illegal advantages. The following payments were made[34]:

---

[32] Arrest Request, *supra* note 27.

[33] Indictment, *supra* note 23.

[34] Plea Bargain, at 28-45.

i. Since 2003, approximately R$150 million reais have been paid for tax benefits in the state of Mato Grosso do Sul[35] through false invoices issued against JBS.

ii. In 2009, payment of R$7 million reais to political party PSD through false invoices issued to Yape Consultoria e Debates Ltda and monthly payments of R$350,000.00 through inflated invoices in a truck leasing agreement issued to Yape Consultoria e Debates Ltda.

iii. In 2010, payment of R$5 million reais to finance the reelection of Cid Gomes, governor of the State of Ceará, in exchange for the release of excise tax credits the government owed to JBS[36].

iv. From 2011 to 2014, payment of bribes to the former governor of the state of Mato Grosso, Mr. Sival Barbosa, in exchange for tax benefits to JBS[37].

v. In 2014, payment of R$20 million reais to finance the candidacy of Camilo Sobreira Santana as governor of the State of São Paulo, in exchange for the release of R$110 million reais in excise tax credits the government owed JBS. The payment was made through fake invoices billed against JBS for services never rendered.

vi. Payments of R$1,000 reais to R$20,000 reais to food regulators in the Federal Inspection Service to work overtime and issue sanitary certificates.

---

[35] *Id. at* 34-45.
[36] *Id. at* 31.
[37] *Id. at* 28.

123. In the Plea Deal (annexes 1 to 21), Joesley confessed to paying facilitation fees to 1,829 people, including politicians and government officials, in exchange for illegal advantages in support of JBS's business. The following payments were made[38]:

i. In 2004, monthly payments of R$50,000 (fifty thousand reais) to Sandri, a friend of former Minister of Planning Mantega to influence the Minister, arrange meetings and obtain illegal advantages to JBS.[39] Payment of R$20 million for the reapproval of legislation decreasing JBS' payroll tax charges.

ii. In 2005, a 4% kickback payment deposited in offshore accounts to Sandri and Mantega, in a U$80 million loan from BNDES to finance JBS' 2005 expansion plan.[40]

iii. In 2007, kickback fees to Mantega in exchange for BNDES acquisition of 12.94% of JBS shares for U$ 580 million.[41]

iv. In 2008, a 1% facilitation fee paid to political party PT plus 1% facilitation fee paid to the president of FUNCEF, 1% to the president of PETROS in exchange for BNDES acquisition of 12.99% of JBS shares for $500 million.[42]

v. In 2009, a deposit in an offshore account of $50 million to Brazilian former President Lula in exchange for BNDES purchase of U$2 billion in JBS debentures to finance JBS's 2009 expansion plans.[43]

---

[38] Plea Bargain.at 28-42, 65- 68, 94, 125.
[39] *Id. at* 113.
[40] *Id.*
[41] *Id. at* 113.
[42] *Id.* at 70-71.
[43] *Id.* at 66.

vi. In 2010, a deposit in an offshore account of $30 million to Brazilian former President Dilma Roussef.[44]

vii. Also in 2010, a donation of R$3 million to former vice president and current president of Brazil Michel Temer[45]; a transfer of R$30 million reais to former Chief of Staff Antonio Palocci to finance former Brazilian President Dilma Roussef's presidential election campaign,[46] and R$1 million reais to finance the election of Senator Marta Suplicy.[47] In addition, he also made a Transfer of R$20 million reais to the former São Paulos's State Secretary for Economics and Planning, José Serra to support his candidacy as Brazilian President.[48]

viii. In 2011, a 4% kickback fee to Mantega in exchange for R$2 billion reais loan from BNDES to finance the construction of Eldorado pulp mill.[49]

ix. Also in 2011, payments of 3% to 3.5% kickback fees to Luciano Funaro in exchange for influencing approval of loans in Caixa Economica Federal (CEF) and Fi-FGTS [investment fund].[50] Deposit of approximately R$450 million reais in a checking account to Cunha to influence loans and contributions from CEF and FGTS.

[44] *Id.*
[45] *Id. at* 79.
[46] *Id. at* 92.
[47] *Id. at* 90.
[48] Plea Bargain, at 91.
[49] *Id.* at 66.
[50] Plea Bargain, at 72.

x. In 2012, Mantega requested Joesley a $5 million loan convertible in shares of a Company called Pedala Equipamentos. The enterprise was unsuccessful and Joesley "forgave" the debt.[51]

xi. In 2014, payment of R$2 million reais to Funaro to federalize the animal inspection system, to repeal the regulations authorizing the application of long-duration and diluted vermifuges and to regulate the exporting of waste.[52]

xii. By October 2014, R$300 million reais in official donations to political campaigns[53], including a transfer of R$3 million reais to Marta Supllicy, in exchange for potential business with JBS if the candidate won the São Paulo City mayoral election[54] and also a payment of R$30 million reais to former Congressman Eduardo Cunha to support his candidacy as President of the House of Representatives.

xiii. In 2016, a payment of R$20 million reais to Cunha to influence Congressmen in voting the renewal of payroll exemption in the poultry sector; payment to Congressman João Bacelar in exchange for not summoning Mantega to testify at the CPI do CARF [a Parliamentary commission inquiry, which investigated fraud against the Brazilian IRS].[55]

xiv. Also in 2016, a payment of R$15 million reais to buy congressional votes in support of Dilma during the presidential Impeachment procedure[56]; a

---

[51] *Id. at* 69.
[52] *Id. at* 75.
[53] *Id. at* 67.
[54] *Id. at* 90.
[55] Plea Bargain, at 88.
[56] *Id. at* 88.

payment to the President of political party PRB Marcos Pereira to guarantee he would maintain the vice president of CEF (a position appointed by the Political Party). The vice president of the bank was overseeing the approval of a R$2.7 million reais loan to JBS.[57]

xv. In 2017, a payment of R$2 million reais to former Senator Aecio Neves da Cunha to help him pay his lawyers in exchange to facilitating the approval of the law on abuse of authority and amnesty to slush funds.[58]

124. Joesley confessed that at least R$150 million reais of the bribery monies were paid through false and inflated invoices issued against JBS[59]; at least R$30 million reais were paid in cash, and no less than $60 million reais were paid to third parties.[60]

125. As part of the Plea Deal, each of Joesley and Wesley agreed to pay a fine of R$110 million reais, 80% to be paid to the Federal Government and 20% to the reimbursement of public interests offended by the crime of money laundering.[61]

## V. <u>MATERIAL MISTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD</u>

126. In order to conceal Defendant's participation in the Brazilian corruption scandals throughout the Class Period, Defendant issued a series of pervasive and material misstatements and omitted material facts in JBS's public filings. These material misstatements and omissions created the false impression that JBS's operations were following the law under a strict scrutiny and that JBS's exponential growth was the result of a great product and brand, under skilled

[57] *Id. at* 87.
[58] *Id. at* 83.
[59] Plea Bargain, at 102-108.
[60] *Id. at* 108.
[61] *Id. at* 49.

management. This false impression caused JBS's stock price to be artificially inflated throughout the Class Period.

**A. <u>False and Misleading Statements in 2014</u>**

127. On January 2, 2014, Defendant issued a press release in JBS's website touting about a 47.6% increase on JBS' stock in 2013 due to increased EBITDA and JBS' acquisitions.

**PRESS RELEASE**

**JBS shares up 47.6% in 2013**

> JBS shares traded on the São Paulo Stock Exchange (BM & FBovespa) registered in 2013 a real appreciation of 47.61% in reais and 27% in dollar terms. The company's shares were among the highest of the Bovespa Index (Ibovespa), showing the highest income among listed food companies. The shares also stood out when compared to the Ibovespa's own trajectory, which reported a reduction of 15.5% in the previous year.
>
> The appreciation of the company's shares in 2013 reflects the improvement in JBS's results as a whole. The data recorded up to the third quarter of last year showed an improvement in cash generation, increased Ebitda accumulation and increased company profits. These factors contributed to prove to the market the solidity of the group. The result this work was reflected in the valuation of the shares and also in the increase of the value of market, which advanced 45.2%.
>
> JBS shares also had a positive impact on two major acquisitions by the company, in the segment of value-added foods. The acquisitions of Seara and Massa Light reinforce participation in the product line that meet the growing demand of consumers for convenience and practicality in the preparation of food. The two businesses tend to have even more impact on the company's shares throughout 2014, as the mergers consolidate.

128. On March 25, 2014, Defendant held a *JBS day* in New York to present results for the fourth quarter and the 2013 year to investors. During the presentation, Defendant

highlighted a 39% increase in EBITDA, compared to the previous year, and forecasted revenues of U$50 billion in 2014, touting its financial achievements:

**JBS at a Glance**

- ✓ Leadership position in the global food industry
- ✓ Estimated revenues of around US$50 billion in 2014
- ✓ Presence in 5 continents and sales to more than 150 countries
- ✓ Production facilities in the low cost geographies
- ✓ Founded in the 1950's in Midwest of Brazil
- ✓ IPO in 2007
- ✓ More than 185,000 employees

**JBS 4Q13 Results Highlights**

- Net revenue of R$27.2 billion, an increase of R$5.4 billion, or 24.6% higher than 4Q12, of which 54% came from organic growth.
- Consolidated EBITDA was R$1,873.5 million, an increase of 60.0% over the same period of last year. EBITDA margin for the quarter was 6.9%.
- JBS ended the year with leverage of 3.70x, considering all debt assumed with Seara acquisition and only one quarter of EBITDA.
- Annualizing 4Q13 EBITDA leverage ended the period at 3.17x.
- JBS net revenue increased 22.7% compared to prior year and reached R$92.9 billion.
- EBITDA totaled R$ 6.1 billion in 2013, 39.0% higher than 2012. EBITDA margin was 6.6%, an increase of 80b.p. over the previous year.
- JBS ended the year with Adjusted Net Income of R$1,194.0 and recorded R$926.9 million of net income, 28.9% higher than 2012 and equivalent to R$323.32 per thousand shares.
- JBS generated net cash from operating activities of R$2,541.0 million, with positive free cash flow of R$635.1 million in 2013.

129. On May 16, 2014, JBS disclosed its Annual Report for the fiscal year ended December 31, 2013, *Annual and Sustainability Report 2013*, (the "2013 Annual Report"). The 2013 Annual Report falsely reaffirmed to investors JBS' adherence to best corporate governance practices:

> ***To improve its decision-making process and ensure respect to all stakeholders, JBS adopts the best practices of corporate governance**. **The company's shares are listed on the Novo Mercado Special Corporate Governance Listing Segment, BM&FBovespa's most rigorous level**, **which requires high level of management and disclosure practices.***
>
> JBS's governance structure defines investment strategies and monitors the company's relationship with shareholders and stakeholders, thereby ensuring value creation and sustainable business development. ***This positioning is based on the principles of transparency, fairness, accountability and corporate responsibility established by the Brazilian Institute of Corporate Governance*** (IBGC).
>
> ***JBS's unrelenting quest to improve corporate governance includes the adoption of best management practices and transparency of information disclosed to the market.***

(Emphasis added).

130. The 2013 Annual Report touted JBS' alignment with Brazilian anticorruption laws:

> ***In 2013, in view of Brazilian Law 12846/13 (anti-corruption law), the Committee created a special working group with the aim of proposing a rewording of JBS' Ethical Conduct Manual, in compliance with the new legal requirements, reaffirming the commitment of the company and its employees to high ethical standards.*** The Committee holds quarterly meetings and is currently composed of six members.
>
> * * *
>
> ***Clear guidelines align JBS' initiatives to ensure the adoption of best governance practices, business management, valuing ethical conduct and integrity.***
>
> * * *
>
> ***JBS' Ethical Conduct Manual reinforces the company's corporate culture with the goal of guiding ethical behavior of employees and suppliers in daily negotiations. In this context, it addresses issues regarding breach, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, among other topics***. In 2013, a review process of the Manual was implemented, in accordance with the requirements

> of Brazilian Anticorruption Law 12846/13. Its new version will be made available in 2014.

(Emphasis added).

131. In the 2013 Annual Report, Defendant also touted its expansion and financial achievements:

> **Successful acquisition history |** ***In recent years JBS acquired important companies. After its IPO in 2007, the company acquired Swift, Smithfield Beef, Five Rivers, Tasman Group, Pilgrim's Pride, Bertin, XL Foods and Seara. These accomplishments have allowed substantial growth in JBS' results, making it the largest protein company in the world.***
>
> * * *
>
> **Financial Performance**
>
> **NET REVENUE AND EBITDA**
>
> ***JBS achieved in 2013 net revenue of R$ 92,902.8 million, 22.7% higher than the previous year. This increase was due to growth in all businesses, particularly in Mercosul***. The growth in net revenue in that unit, 43.3%, was driven by improved sales both domestically and in exports, coupled with the consolidation of Seara in the 4Q13. EBITDA in 2013 was R$ 6,130.3 million, an increase of 39.0% compared to 2012. The consolidated EBITDA margin in 2013 was 6.6%. This reflects the improved performance of all business units, especially for operations of Mercosul that had growth in EBITDA of 9.8% and poultry in the United States (PPC) recording growth in EBITDA of 100.1%.

132. Furthermore, the 2013 Annual Report highlighted JBS' government support, omitting the kickback fees associated with such support:

> **DEBT PROFILE**
>
> ***Regarding the proceeds of government support, JBS took bank credit in the amount of R$ 20 million from the National Bank for Economic and Social Development (BNDES),*** less than 0.1% of the consolidated indebtedness of the Company, to qualify for federal and state tax incentives. GRI EC4.

(Emphasis added).

133. On December 22, 2014, in response to a report published by Brazilian local news associating JBS to the corruption scheme investigated under *Operation Car Wash*, Defendant issued a press release denying any participation in the scheme and falsely assuring investors its compliance with the law:

**NOTICE TO THE MARKET**

> **JBS STRONGLY DENY NEWS THAT ASSOCIATES THE COMPANY WITH BANK ACCOUNTS INVOLVED IN OPERATION CAR WASH AND THAT THE REFERRED PAYMENTS ARE NOT OBJECT OF ANY SCHEME**
>
> JBS S.A. ("JBS", "Company") hereby informs its shareholders and the market in general that, in Regarding the news published today in the Valor Econômico newspaper ("Valor"), ***there is no association of the Company to a company targeted for investigation of the operation known as "Car Wash".***
>
> The Company clarifies that the payments mentioned in the matter of the Value come from a acquisition agreement of the industrial unit in Ponta Porã in Mato Grosso do Sul, a of Distribution in São José dos Pinhais in Paraná and another Distribution Center in Itajaí, Santa Catarina, whose sellers were Tiroleza Alimentos Ltda., Ademar Marquetti de Souza, Paulo Roberto Sanches Cervieri and Rodo GS Transportes e Logística Ltda. The payments related to the acquisition were made in the bank accounts indicated by the sellers, and Rodo GS indicated in 2012 the accounts that are currently subject of the investigation mentioned in the matter.
>
> ***JBS reiterates that the payments were made in accordance with the contract signed by the parties, as well as in compliance with current***

> ***legislation and that the Company has all of the documentation proving the veracity of the aforementioned facts.***

(Emphasis added).

## B. False and Misleading Statements in 2015

134. On March 12, 2015, the Defendant held an investors meeting to present results for the fourth quarter and fiscal year 2014. During the presentation, JBS reported a 29.7% increase in EBITDA compared to the previous year.

135. On April 14, 2015, in response to local news accusing JBS of receiving illegal tax benefits, Defendant issued a press release denying the accusations and reassuring investors of JBS' compliance with all legal procedures, including the collection of taxes:

> **NOTICE TO THE MARKET**
> **JBS COMMENTS ON MEDIA REPORTS**
>
> JBS S.A. (BM & FBOVESPA: JBSS3, OTCQX: JBSAY, "Company") clarifies news reporeted in the media today on the payment made five years ago of R$200 thousand. The Company confirms the payment was made to the company Limiar Consultoria e Assessoria em Comunicação Ltda, CNPJ 10.874.328 / 0001- 90, in for marketing consultancy.
>
> ***The Company states that the payment occurred within the laws, and there is no illegality in the act***. The Receita Federal Office [Brazilian IRS] had already requested clarification on the payment in question, which was promptly provided by JBS. ***The Company reiterates that all legal procedures have been followed, including but not limited to the collection of taxes.***

(Emphasis added).

136. The same day, JBS issued a letter response to the CVM reiterating the false statements regarding JBS' compliance with the Brazilian laws. In relevant part:

> Dear sir, In response to your request, JBS S.A. ("Company" or "JBS") hereby clarifies the content of the news published on April 12, 2015 in the newspaper O Globe under the title "Zelotes: JBS and BRF appear on the recordings" ("News").

> The Company clarifies that it has no connection with Operation Zelotes of the Federal Police. According to the Federal Police, the Company appears in a recorded conversation between Mr. Paulo Borges and the member of the Administrative Council of Tax Appeals of the Ministry of Finance - CARF - Mr. Jorge Victor Rodrigues.
>
> ***JBS notes that it does not know Mr. Paulo Borges and has never authorized anyone to negotiate any matter on behalf of the Company.*** In addition, JBS asserts that it has no contact with this counselor (Mr. Jorge Victor Rodrigues) who in the News himself admits never to have had contact with any representative of JBS.
>
> * * *
>
> ***It should be noted that all federal tax administrative processes that the Company is a party to are conducted by an in-house team of highly qualified lawyers***.
>
> ***Finally, JBS reaffirms its commitment to transparency in all its operations and does not share or condone with illicit practices.***

(Emphasis added).

137. On May 19, 2015, the Defendant issued a press release touting about S&P's positive outlook on JBS as a reflection of JBS's strong EBITDA and acquisition strategy:

> **NOTICE TO THE MARKET**
>
> **JBS S.A. and JBS USA Holdings had a high rating for Standard & Poor's for BB +, with positive outlook**
>
> JBS S.A. (BM & FBOVESPA: JBSS3, OTCQX: JBSAY, "Company", "JBS") hereby informs its shareholders and the market that today the rating agency Standard & Poor's ("S & P"), raised the rating of JBS S.A. and its subsidiary JBS USA Holdings ("JBS USA") from BB to BB +, with a positive outlook.
>
> ***According to the S & P report, "the rise in ratings is a reflection of stronger EBITDA and cash generation margins***, which has resulted in a significant reduction in indebtedness over recent quarters, despite the acquisitions of Primo Smallgoods, Tyson Foods and Big Chicken, which totaled an approximate amount of R $ 5.0 billion. "

> Also according to the report, "the company's strong geographical and portfolio diversification, as well as its economies of scale as the largest global producer of proteins, should mitigate the volatility in its results."
>
> ***The elevation of JBS and JBS USA's ratings is a reflection of the successful integration of several companies that JBS has acquired over the last few years, as well as improvement in consolidated results, including a increase in cash generation and EBITDA in recent quarters, resulting in a reduction in the company's financial leverage.*** The improvement in such metrics is due to the constant focus of The Company in its commitment to operational excellence, with deleveraging and the generation of shareholder value.

(Emphasis added).

138. On June 02, 2015, JBS disclosed its Annual Report for the fiscal year ended December 31, 2014, *Annual and Sustainability Report 2014* (the "2014 Annual Report"). The 2014 Annual Report repeated JBS's previous boilerplate statements on corporate governance, disclosure of material information and securities trading:

> ***Corporate Governance***
>
> ***Policies***
> ***To ensure ethical conduct and integrity in the management of its business, JBS has clear policies regarding the issues relevant to the company's best practices***. They are:
>
> ***Disclosure Policy for Material Information***
> ***Based on the principles of transparency and fairness in dealing with investors and the capital markets, this policy establishes the use and disclosure of information classified as material facts***, as well as rules and guidelines about the use, publication and maintenance of the confidentiality of information that has not been released to the public yet.
>
> ***Securities Trading Policy***
> ***Based on CVM Instruction 358/02, this policy aims to prevent and punish the use of insider information to benefit persons related to the trading of securities issued by JBS***, as well as set forth the guidelines governing the securities' trading.

(Emphasis added).

139. The 2014 Annual Report highlighted the reformulation of JBS' Manual of Ethical Conduct to adhere to 2013 Brazilian anti-corruption law:

> **Ethical Conduct**
> GRI G4-56
>
> ***In order to guide the conduct of its team members and suppliers in the business environment, JBS prepared a Manual of Ethical Conduct that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics.***
>
> ***In 2014, JBS' legal department began the process to reformulate the document to adhere to Brazilian Law 12,846/13 regarding anti-corruption and the acts that regulate it. The new version of the Ethics Manual is scheduled for release in 2015.***

(Emphasis added).

140. Additionally, the 2014 Annual Report contained a letter from Individual Defendant Wesley boasting about JBS' 81% increase in EBITDA and JBS's position as second largest food company in the world. The 2014 Annual Report also contained a summary of JBS's financial performance:

> **JBS had great victories and achievements in 2014.**
>
> ***We continued to harvest from the transformational movements that we performed in the last few years in order to transform our Company into a multinational of Brazilian origin. We feel certain that the timing of the relevant investments made by us could not have been better or more opportunistic. Today, these investments bring excellent results to our Company.***
>
> * * *
>
> ***We reached more than R$120 billion in consolidated net sales in 2014, an increase of 30% compared with 2013. This made us the largest Brazilian private company in terms of revenues. In 2014, we were also ranked as the second largest food company in the whole world. Our EBITDA was R$11.1 billion, which represents an increase of 81% over the previous year, with an EBITDA margin of 9.2%. Our net income came in at R$2.0 billion, also presenting an impressive improvement of***

***120% over 2013. In addition, we evolved in our cash generation from operations, which reached R$9.0 billion, and in free cash generation, after investments, of R$4.7 billion.***

* * *

**Financial Performance**

**Net Revenue (R$ million)**
In 2014, consolidated net revenue totaled R$120.5 billion, 29.7% higher in relation to 2013.

Approximately 74% of JBS's global sales were derived from domestic markets where the company operates and 26% through exports.

**83% of JBS' revenue in 2014 was generated in US$ dollars**

**Profit**
**Gross Profit**
Gross profit at JBS totaled R$18.7 billion, an increase of 57.6% in relation to 2013.
Gross margin was also 2.7 p.p. higher.

**Net Income**
Net Income in 2014 totaled R$2.0 billion, 119.6% higher than 2013 – with a net income per thousand shares of R$706.49.

**Adjusted EBITDA**
In 2014, adjusted EBITDA registered by the company totaled R$11.1 billion, 80.9% higher - or R$4.96 billion – than 2013. The EBITDA margin also increased 2.6 p.p. in the period compared, reaching 9.2% in 2014.

**Cash Flow**
**Operating Cash Flow**
JBS's Operating Cash Flow in 2014 totaled R$9.0 billion, 253.7% higher than 2013.

**Free Cash Flow**
Free cash flow totaled R$4.7 billion in 2014, an increase of 641.6% in relation to 2013.

**At the end of 2014, the company's market value totaled R$ 32,968.81 million.**

(Emphasis added).

## C. False and Misleading Statements in 2016

141. On January 28, 2016, Defendant issued a press release commenting on ongoing police investigations. In the press release, Defendant straight-up lied to investors denying any misconduct:

> **NOTICE TO THE MARKET**
> **JBS Clarifies News in the Media in the Last Month**
>
> JBS S.A. (BM & FBOVESPA: JBSS3, OTCQX: JBSAY, "JBS" or "Company") hereby informs its shareholders and the market in general about recent events involving the Company.
>
> **BNDES CPI**
>
> Since the fourth quarter of 2015, the name of JBS has been mentioned within the scope of the BNDES CPI, which investigates BNDES 'financing and lending operations in general. JBS has always made clear that its relationship with the bank was due to the sale of shares to BNDESPAR and not to subsidized interest rate on financial loans, as is commonly reported in the press and the market. ***All the capital increase operations that BNDESPAR participated in took place in a clear and transparent manner and all corporate actions were carried out in accordance with Brazilian capital market legislation,*** are public and are available on the website of the Brazilian Securities and Exchange Commission. cvm.gov.br) and the JBS Investor Relations website (www.jbs.com.br/ri). ***JBS is absolutely undisturbed by any result of the CPI and sees no reason or hypothesis in which this matter would harm the operations or business of the company.***
>
> **BNDES Audit at TCU**
>
> The Brazilian Federal Audit Court (TCU), in its role as a supervisory body, is auditing the BNDES and not JBS. ***Nevertheless, the Company has always made it clear to its shareholders and the market in general that all corporate actions arising from BNDESPAR's investments were carried out in accordance with the Brazilian capital market legislation,*** are public and are available on the website of the Brazilian Securities and Exchange Commission (www.cvm.gov.br) and the investor relations website of JBS (www.jbs.com.br/ir). It should also be noted that JBS was already a public company with shares traded on Bovespa and all BNDESPAR investments in JBS occurred at market values, within the CVM's

scrutiny and in accordance with current legislation. ***The BNDES has positioned itself on the current stage of analysis of the TCU, saying that the court decided to deepen its work and that this stage will be an opportunity for the bank to clarify questions and demonstrate that the operations were profitable and performed with the technical rigor, impersonal form and smoothness usual of the BNDES. JBS has absolute conviction and tranquility in affirming that all the business done with BNDESPAR was carried out with total transparency, seriousness and smoothness. Therefore, the company does not have the slightest fear that at the end of the process, the result affect the business or even the company's financial position.***

**<u>Complaint from the MPF [Federal Prosecution Service]</u>**

***Regarding the reports about the complaint filed by the Federal Prosecution Service (MPF) regarding the crimes against the financial system involving Joesley Batista, Chairman of the Board of Directors of JBS and Chairman of J&F Investimentos, the company clarifies that JBS is not a related party in the process. The complaint presented came from an inspection carried out in May 2012, carried out by Banco Central at Banco Original.*** The bank presented its defense in the administrative instance and proof of the lawfulness of the operations. The proceeding resulted in a fine in the amount of R$250,000.00 to the directors and did not cause any personal impediment to them, who remain entitled to continue acting in the financial market. JBS reinforces J&F Investimentos' note that it has not yet had access to the file. After reviewing the documents, J&F will present its defense, arguments and evidence showing that the financial transaction was made in the light of the market and rigidly according to the rules of the regulator (Central Bank). These facts endorse the arguments already put forward in the administrative Central Bank, reinforcing its innocence and its executives and removing any doubt of malice in the operation. ***JBS has the utmost confidence that this process will be resolved without any harm or financial threat to the Company by the manner in which the companies controlled by J&F Investimentos are independently governed by their own management and observe an ethical conduct adopted by all its executives.***

**<u>Unfounded news</u>**

In addition, Wesley Batista was misleadingly quoted in a blog post, which attempts to relate it to the new phase of the Lava Jato, Triple X operation. The company clarifies that the executive was never the owner, partner or beneficiary of Avel, mentioned by the blog, having only acted as its proxy between 2006 and 2008.

* * *

> ***The Company regrets that the moment that Brazil lives contributes to encourage news that generate uncertainties, questions and losses for those who believe and invest in JBS. The Company reaffirms that it is absolutely confident, tranquil and certain to clarify these issues and is available to resolve any doubts and questions that may remain with shareholders, investors, analysts and stakeholders in general.***

(Emphasis added).

142. The same date, in response to an inquiry from the CVM regarding the disclosure of material facts that caused a decline on JBS' stock price, and that were object of the Federal Prosecution Service complaint, Defendant JBS stated the facts did not involve JBS and that the decline was due to an imprecise association made by the investing public between J&F and JBS brands:

> ***In this context, the Company understands that the matter disclosed in the News was not a material fact, pursuant to CVM Instruction 358, since such matters are not related to the Company's business, mainly because the Company is not a party to the denunciation offered by the Federal Public Ministry.***
>
> ***Therefore, the Company understands that the decrease in the quoted price of the shares issued on the stock exchange is due to an imprecise association made by the investors between the Company and the claims reported in the News, over which the Company has no control, and said decrease was not predictable or weighted by the Company.*** However, the Company understands that this inaccuracy has been remedied with the publication to the Market on this date.

(Emphasis added).

143. On March 01, 2016, in response to a CVM inquiry regarding published news affirming that Receita Federal had discovered a fraud in the process of merger of JBS and Bertin, Defendant JBS denied any wrongdoing:

> ***"…[t]he Company clarifies that the operation involving Bertin S.A. was carried out in 2009, in full transparency and strict compliance***

> ***with current corporate laws.*** The transaction occurred through the merger of shares, that is, the controlling shareholders of Bertin S.A. gave their shares in Bertin in exchange for shares of JBS S.A., which were granted to the capital of FB Participações S.A. due to the capital increase carried out by FIP Bertin. Thus, the transaction did not involve any financial contributions. The entire operation was detailed with relevant facts at the time.
>
> JBS S.A. further notes that the merger negotiations were conducted among the "controlling shareholders of JBS" and the "controlling shareholders of Bertin", and the Company accessed and made available to its shareholders all documents of the merger as of December 28, 2009, that is, when Bertin SA became a wholly-owned subsidiary of JBS SA.
>
> ***The Company states that there was no fraud, attempted fraud or any subtraction of any equity interest, since the merger operation took place in light of the legislation in force and with legal and tax advisors*** from Barbosa, Müssnich & Aragão Advogados and Pinheiro Neto Advogados, as well as the financial advisory services of the banks JP Morgan SA and Banco Santander Brasil SA In addition, the company also participated in the transaction, the company Apsis Consultoria Empresarial Ltda, which was responsible for the equity of Bertin S.A .

(Emphasis added).

144. Also in March 2016, Defendant made available on its website JBS' updated *Manual of Ethical Conduct* (the "2016 Manual"). The 2016 Manual contains a message from Wesley falsely assuring investors that ethics and integrity are inherent values in JBS:

> ***The Manual of Conduct is the improvement of a belief that was born with JBS and comprises many decades of ethics and integrity.*** It's global and applies to all our employees, and also to the most varied types of suppliers and third parties with which JBS has a relationship. ***The updated version of this Manual, launched in March 2016, works as a guiding tool for JBS' relationships with its employees, partners and with those that represent the Company. The Manual reinforces JBS' posture all over the world, regardless the number of countries or employees***. It is – and must be used as – a consultation document by all employees as it establishes the guidelines we believe to be the most adequate to be followed. Integrity and ethics are part of the conduct of each of us and based on people's freedom and responsibilities, both in individual terms and in their mutual

> relationships. They are not something simple to explain in words, but we all know what they mean. ***We believe that, by following the guidelines in this Manual, we will be able to further strengthen JBS' values, what is a reason of pride for each one of us.***

(Emphasis added).

145. The 2016 Manual stresses JBS' leadership responsibility for ethical compliance:

> **1. WHO IS RESPONSIBLE FOR JBS' ETHICAL STANDARDS?** ***To behave with integrity is a commitment of all those who have a relationship with JBS. Accordingly, this Manual must be followed by anyone who works for or represents JBS, including employees, affiliated companies and third parties that have a business relationship with JBS, in all geographies.***
>
> * * *
>
> **JBS leaderships' responsibilities**
>
> ***JBS leaders are responsible for encouraging a culture of integrity.*** All JBS leaders are committed to:
>
> • ***Communicating, to their teams, the importance of integrity and the relevance of complying with these standards, encouraging an ethical conduct and the full compliance with JBS' policies and giving the example through their actions;***

(Emphasis added).

146. Additionally, the 2016 Manual contains several boilerplate statements expressly prohibiting corruption, money laundering, insider trading and other unethical behaviors:

> **3.7. Anti-corruption Practices**
>
> ***To make pledges and offer, receive or authorize any type of bribe, either directly and indirectly, with the objective of obtaining or granting undue advantages are an unacceptable conduct and expose JBS and its employees to possible legal actions. It's strictly forbidden to make undue payments to government officials or representatives of the private sector, including facilitation fees, in any and all business transactions and countries.***

***We keep exact commercial records, accounts, books and agreements to ensure that they correctly reflect the nature of transactions and payments.***

***JBS respects employees' right to participate in political processes. However, employees are banned from making any political contribution in cash, goods or services on behalf of JBS. Accordingly, do not make pledges, offer or contribute with corporate funds or other business assets for political purposes without a formal prior approval obtained according to the local procedures and regulations.***

***Any third party that represents JBS as a consultant, sales representative, distributor or service provider must comply with the policy on the prevention of undue payments and the applicable anti-corruption laws and must not facilitate or get involved in any type of bribe or corruption.***

* * *

**3.8. Relationship with Government Agencies**

***In our work, we frequently interact with government agencies and agents to do businesses. Interactions with government entities take place in several situations, such as supervisions, meetings and participation in bids, among others. Regardless the circumstance, JBS' employees must be transparent and act in an ethical manner, meeting the applicable laws and regulations, including special requirements related to the contact with public agents and codes of conduct of the public administration. Employees and third parties that interact on behalf of JBS with government agencies must be aware of and observe the local legal and regulatory laws.***

* * *

**3.11. Money Laundering Prevention**

***People involved in illicit activities, such as corruption, drug trafficking or frauds, can try to make proceeds coming from criminal conduct appear to have derived from a legitimate source, a practice known as "money laundering."***

***JBS is committed to fully complying with the laws to fight money laundering all over the world.*** With that in mind, JBS' businesses must implement evaluation and customer relationship procedures based on the "Know your customer" model, and take the necessary

> steps to identify and block inadequate or suspect manners of payment. The failure to detect relationships and transactions that put JBS at risk can deeply affect the Company's reputation.
>
> **3.12. Privileged Information and Negotiation of JBS' Securities**
>
> ***The use of material information not yet disclosed to the market by the professionals involved in the negotiation of JBS' securities is a conflict of interests and a violation to the laws and regulations on the capital market. JBS has a policy to avoid this type of conflict and all employees with access to privileged information must read and sign the term of agreement to JBS' Trading Policy for Securities.***
>
> ***Employees with access to privileged information are banned from buying, selling, recommending or suggesting that other people buy and sell the Company's shares in the 90 (ninety) days prior to their acquisition and must observe the blackout period, as established in the Company's Trading Policy for Securities, available in JBS intranet and in the Company's investor relations website.***

(Emphasis added).

147. On May 10, 2016, in response to a CVM inquiry regarding published news linking JBS to illegal campaign donations to former Brazilian President Dilma Roussef, Defendant JBS issued a response letter, published in JBS's website, denying any wrongdoing and falsely stating that all JBS contributions to political campaigns were law abiding:

> "Dear sir,
>
> We refer to the news published on the website of the newspaper O Globo, in O País, on 07.05.2016, under the title "Monica Moura, wife of João Santana, told Car-Wash that the company paid off debt with marketing company", Which contains the following information:
>
> "Mônica Moura, the wife and partner of the marketer João Santana, who negotiates a Plea Deal, told prosecutors that JBS, the world's largest food processor, made cash donations to President Dilma's campaign in 2014 by clearing PT [the Workers Political Party] debts with Focal.
>
> (...)

JBS denies and claims not to have found in its accounting payments made to the marketing company. The wife of marketer João Santana, Monica Moura, told prosecutors - in testimony during negotiation to close the Plea Deal agreement - that JBS paid slush funds to the campaign for the re-election of Dilma Rousseff. According to the report, the company paid directly the debt of the PT with the graphic Focal Confection and Visual Communication, of São Bernardo do Campo, in the ABC of São Paulo. This payment is not declared to the Electoral Court.

(...)

***JBS donated $ 361.8 million in the 2014 election, legally. The company strongly denies the claim, says that it has scoured all its files and has not found registration of the alleged payment.***

GLOBO learned that Focal has issued service invoices for JBS, but has never printed a piece or rendered services to the company, the world's largest animal protein processor, which has BNDES and Caixa as partners, with 27% of the capital. The notes issued for the payments were delivered personally at the headquarters of JBS, in SP, by officials of Cortegoso. (...)

Asked by GLOBO, JBS said that it had not located any accounting of payment to Focal or to other companies registered in the name of Carlos Cortegoso and people related to him. "A survey was made with respect to the Companies mentioned and there is no payment to them, "the company said. ***JBS said it "sees its name once again involved in unfounded denunciations," made in an "irresponsible way, assaulting their image, brands and reputation. "***

In this regard, we require your statement on the veracity of the statements made in the news, and if so, we request a manifestation about the measures being taken by the Company in this regard, as well as the reasons why it understood that it is not the subject of Material Fact, pursuant to CVM Instruction 358/02. Such manifestation shall include a copy of this Official Letter and be forwarded to the IPE System, "Notice to the Market", type "Clarifications on CVM / BOVESPA consultations" (...) "

Dear Sirs,

* * *

***First, the Company clarifies that it has taken cognizance of the facts News through the media.***

> ***In this sense, the Company notes that it has audited all its files since the year 2012 to date, has scanned your files and found no payment or invoice for any of the companies mentioned in the matter. The Company reiterates that donations for election campaigns were conducted in accordance with the regulations of the Electoral Superior Court (TSE).***
>
> ***JBS regrets that once again unfounded accusations are made in an irresponsible way assaulting its image, marks, reputation and ethical conduct.***
>
> ***Notwithstanding what is informed in the paragraph above, the Company's understanding is that said notice does not constitute, pursuant to CVM Instruction 358, a relevant act or fact***, since such fact does not fall within any of the exemplary scenarios provided for in sole paragraph of article 2 of CVM Instruction 358.

(Emphasis added).

148. On June 10, 2016, JBS issued its Annual Report for the fiscal year ended December 31, 2015, *Annual and Sustainability Report 2015* (the "2015 Annual Report"). The 2015 Annual Report highlighted JBS' best corporate governance practices, including monitoring and supervision of management and controlling shareholders:

> Being the best in all that we do is what guides the activities of JBS. ***Therefore, the Company constantly seeks to adopt the best corporate governance practices, to maintain the proper balance in the allocation of rights, powers, duties and responsibilities among managers, the Board of Directors and shareholders.***
>
> * * *
>
> JBS S/A trades its shares on the Novo Mercado of the BM&FBovespa, the listing segment that sets the standard for best Corporate Governance practices among listed companies. For inclusion in this segment, ***JBS voluntarily assumes Corporate Governance commitments that go beyond the requirements of the current legislation.***
>
> ***This implies, for example, adherence to ethical and sustainable conduct, because the rules state that information must be provided***

> ***to facilitate the monitoring and supervision of the acts of management and the Company's controlling shareholders.*** The Novo Mercado regulations also seek to promote the adoption of corporate rules that better balance the rights of all shareholders, regardless of their condition as a controlling shareholder or investor.

(Emphasis added).

149. The 2015 Annual Report touted the creation of a Corporate Compliance Office and the reissuance of JBS's Code of Ethics:

> ***Ethics and Integrity***
> ***GRI G4-56, G4-DMA***
>
> ***Trust is what guides JBS in all of its relations with stakeholders. It therefore pervades the Company's daily activities.***
>
> ***In line with this value and with the aim of reinforcing conduct guidelines, improving and standardizing certain procedures and implementing risk prevention initiatives where needed, in 2015 the Company created the Corporate Compliance Office***. Reporting directly to the Institutional Relations Department, the new structure serves all JBS Group businesses and is responsible for identifying, assessing and monitoring risks, as well as developing training and communication programs for all employees and suppliers.
>
> ***One of the new area's first initiatives was the reissue of JBS's Code of Ethics.*** The document, which is intended both for the Company's employees and suppliers, established twelve guidelines governing expected conduct in regard to issues related to security, sustainability, anti-corruption practices, money laundering and conflicts of interest.

(Emphasis added).

150. Furthermore, the 2015 Annual Report touted JBS' new 2015 *Policy on Relations with Government Entities and Public Officials*:

> ***JBS is committed to adhering to the highest standards of integrity, ethics and transparency when interacting with government officials and public officials. To guide the conduct of team members and outsourced consultants who interact with the government in the performance of their duties, the Policy on Relations with Government Entities and Public Officials was published in Brazil in 2015.*** The document, which is applicable to operations in the country, establishes criteria and rules of

> conduct in the relations of JBS companies with government and/or public officials for meetings, the delivery and receipt of documents and other contact necessary to obtain licenses and permits, present claims, participate in bids and discuss matters relating to the JBS operations that depend on government action.
>
> ***In all jurisdictions in which JBS operates worldwide, ethics and anti-corruption training is offered in order to ensure compliance with local laws.***

(Emphasis added).

151. The 2015 Annual Report also contained a message from Wesley touting JBS' 20% increase in EBITDA and significant financial progress:

> ***A YEAR MARKED BY SIGNIFICANT PROGRESS IN IMPROVING OPERATIONAL STRENGTHS AND PORTFOLIO DIVERSIFICATION GRI G4***-1
>
> Our global production platform, unique in the market, combined with our relentless pursuit of operational excellence, permitted us to generate good results during 2015. ***It was a notable year for JBS as we evolved significantly in our strategy. We strengthened our operations in key food producing regions globally and diversified our portfolio, adding significantly more value to our products, under our reputable and well-known brands.***
>
> ***Our consolidated sales reached R$163 billion in 2015, an expansion of 35% compared to 2014. In this period, 30% of our global sales were through exports, which added up to US$15.4 billion, with Asia and the Middle East as key markets. EBITDA was R$13.3 billion, an increase of 20% over 2014, with an EBITDA margin of 8.2%. Net income for the year improved substantially and totaled R$4.6 billion, 128% higher than 2014, equivalent to R$1.60 EPS. On the financial side, our discipline contributed to elevate JBS credit ratings at all three main rating agencies during the year. We remain dedicated to improve our financial metrics, providing solidity and consistency to our business.***
>
> Another highlight during the year was the operating cash generation, totaling R$21.2 billion. This allowed us to grow and conclude strategic acquisitions.

* * *

> ***In the past eight years, JBS has gone from a Brazilian company specializing in beef, with R$3.9 billion in revenue, to become the second largest global food company, with R$163 billion in revenue in 2015.***
>
> ***This accelerated growth occurred mainly through acquisitions. A variety of companies were acquired during this period, which has been a winning strategy. JBS developed a successful management model to rapidly integrate new operations in the Company's Culture, reducing operating costs and achieving synergy gains. GRI G4-9***

(Emphasis added).

152. On July 01, 2016, JBS issued a press release commenting on local news that Eldorado paid bribes to politicians. In the press release, Defendant JBS informed investors that JBS and its executives were not a target in the investigation:

**NOTICE TO THE MARKET**

> JBS IS NOT A TARGET IN THE FEDERAL POLICE INVESTIGATIONS
>
> JBS S.A. (BM & FBOVESPA: JBSS3; OTCQX: JBSAY, "JBS" or "Company"), hereby informs its shareholders and the market in general that, in relation to the published news, ***the Company, as well as its executives, is not a target and is not related to the operation of the Federal Police occurred this morning.***

(Emphasis added).

**D. <u>False and Misleading Statements in 2017</u>**

153. On March 17, 2017, JBS issued a press release commenting on Operation Weak Flesh and denying any wrongdoing:

**NOTICE TO THE MARKET**

> JBS SA (IBBS: JBSS3, OTCQX: JBSAY, "Company", "JBS") hereby informs its shareholders and the market in general that, in relation to the operation carried out by the Federal Police this morning, JBS clarifies that there is no no legal action against its executives. The company also informs that its headquarters was not the target of this operation.

> The action started today in several companies located in several regions of the country, also occurred in three productive units of the Company, two of them in Paraná and one in Goiás. In the unit of Lapa (PR) there was a judicial measure issued against a physician veterinarian, an employee of the Company, assigned to the Ministry of Agriculture.
>
> ***JBS and its subsidiaries act in full compliance with all regulatory standards regarding the production and marketing of food in the country and abroad and supports actions aimed at punishing noncompliance with such standards.***
>
> JBS in Brazil and worldwide adopts strict quality standards, with systems, processes and controls that guarantee food safety and the quality of its products. The company also notes that it has several certifications issued by recognized entities throughout the the best practices adopted in the manufacture of its products.
>
> ***The Company strongly rejects any adoption of practices related to the adulteration of products - whether in production and / or commercialization - and remains at the disposal of the authorities with the best interest in contributing to the clarification of the facts.***

(Emphasis added).

154. On May 12, 2017, JBS issued a press release denying any wrongdoing in the investments received from BNDESPar and falsely misstating that all investments were carried out under the supervision of the CVM.

**NOTICE TO THE MARKET**

> JBS SA ("JBS" or "Company" - BVM & FBOVESPA: JBSS3; OTCQX: JBSAY), pursuant to Securities Commission Instruction 358 of January 3, 2002, hereby informs its shareholders and the market in general that, in relation to the investigation that was reported today, clarifies the following:
>
> All BNDES investment in JBS was made through BNDESPar, its investment arm, when the Company already had shares listed on the stock exchange, in accordance with the Brazilian capital market laws, without any illegal favor to the Company. All transactions carried out between BNDESPAR and the Company were disclosed to the market

> through Market Notices and Material Facts, available on the CVM website and on the JBS investor relations website.

(Emphasis added).

155. On May 15, 2017, the CVM sent an inquiry letter to JBS questioning the lack of disclosure of material facts under *Operation Bullish* and asking clarification about the misleading statements made by JBS that BNDESPar transactions were done under the scrutiny of the CVM. JBS ignored the question about disclosure, but acknowledged the misleading statements about CVM:

> "1. We refer to the news published on the website of the newspaper O Globo, on 05/12/2017, under the heading "JBS denies favoring in BNDES transactions, bank says its is collaborating with authorities", which includes the following information:
>
> JBS denies favors in BNDES transactions, bank says it is collaborating with authorities
>
>> *Meatpacker stated that operations were approved by the CVM*
>> ***After the outbreak of the operation by the Federal Police, JBS denies that it was favored by the transactions made with the National Development Bank (BNDES), through its subsidiary BDNESPar, and that all transactions were performed according to the rules of the capital markets in Brazil.*** *Meanwhile, the BNDES issued a note stating that is looking for information about the transactions, and is supporting its employees and collaborating with the authorities.*
>> *"**The entire BNDES investment in the company was made through the BNDESPar, its investment arm, complying with market rules and within all formalities.** **<u>These investments were carried out under the supervision of the Brazilian Securities and Exchange Commission (CVM) and in accordance with current legislation.</u>** There was no favor to the company", stated JBS.*
>> *This morning, the PF [Federal Police] started Operation Bullish, which investigates frauds in contributions granted by BNDES. The contributions were made after the hiring of a consulting firm linked to the former parliamentary Antonio*

*Palocci, and had a record processing time, according to the newspaper O GLOBO a source linked to the case. Palocci is arrested in Curitiba (PR).*
***According to the meatpacker, the entire relationship with public and private banks is done transparently and within the rules. "All corporate actions arising from BNDESPar investments were carried out in accordance with the Brazilian capital market legislation, are public and are available on the CVM website and on the investor relations website of the JBS****, "the company concluded.*
*The BNDES reported in a statement that it is seeking information on the operation and will make another pronouncement until the end of the day".*
*On Operation Bullish, set off this Friday, 12, by the Federal Police, the National Development Bank (BNDES) clarifies that it is seeking information on the operation of the PF and supporting their employees. The #BNDES collaborates with authorities. The president Maria Silvia Bastos Marques is in a meeting in Brasília, returning to the Bank in the next few hours. The BNDES will make another pronouncement until the end of the day".*

2. In this regard, we request your statement on the reasons why you believe that the outbreak of the operation of the Federal Police involving the Company it was not a Material Fact, pursuant to CVM Instruction 358/2002.

3. In addition, JBS should clarify what it meant by the statement that "these investments occurred under the scrutiny of the Brazilian Securities and Exchange Commission (CVM)", as the CVM, as part of its supervisory power under Laws 6,404 1976 and No. 6,385 / 1976, and standards referenced therein, does not evaluate, nor approve, any kind of investments".

Dear Sirs,

***The Company clarifies that the CVM's "under review" statement, which was included in the press release issued on May 12, had the purpose of clarifying that the transactions carried out with BNDESPar were in line with Brazilian legislation on capital markets, including, but not limited to, disclosures to the market in general through material and market-related facts and use of CVM Opinion 35 to establish the exchange ratio on the merger of Bertin shares into Company.***

> ***However, the Company agrees that the use of said expression caused a misunderstanding. In order to correct such situation, the Company disclosed on the same date a notice to the market, in which it clarified that the transactions were in compliance with the legislation and the standards published by this Autarchy***. Being what we had at the moment, we remain available for further clarification.

(Emphasis added).

156. On May 15, 2017, JBS filed its quarterly report for the quarter ended March 31, 2017 (the" 2017 First Quarter Report"). The 2017 First Quarter Report disclosed net income of R$422 million reais (U$135.7 million), below a consensus estimate of R$857 million reais net income, as it dealt with the effects of the food safety corruption scandal. JBS said that significant impacts were not expected in JBS's operations and that the effects of the investigation would not be lasting.

* * *

157. The statements in Sections V.A. through V.D. above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to JBS's business, operations, and prospects, which were known to Defendant and Wesley and Joesley or recklessly disregarded by them. Specifically, Defendant made false and/or misleading statements and/or failed to disclose that: (1) Joesley and Wesley bribed over 1800 people, including politicians, public officials and regulators to obtain tax benefits and to facilitate licenses, loans, investments, and other illegal advantages for Defendant JBS; (2) Joesley and Wesley traded on the public and OTC markets based on privileged information; (3) JBS's fast expansion in the Brazilian and international markets and exponential growth was an outcome of Defendant's corruption practices. As a result, JBS's statements about JBS's finances, business, operations and prospects were materially false and misleading and/or lacked reasonable bases at all relevant times.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

158. As alleged herein, Defendant acted with scienter in that it knew that the public documents and statements issued or disseminated in the name of JBS were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

### A. Joesley and Wesley Knowingly And/Or Recklessly Made Material Misstatements And /Or Omitted Material Facts

159. As discussed herein, Joesley and Wesley were confessedly involved in a large corruption scheme in Brazil that impacted Defendant JBS' expansion and positive results during the Class Period. Therefore, Joesley and Wesley knew that the public documents and statements issued in the name of JBS during the Class Period were materially false and misleading to the investing public.

### B. Joesley and Wesley Had Motive to Make Material Misstatements And /Or Omit Material Facts

160. Joesley and Wesley had motive to make material misstatements and omit material facts considering that JBS's exponential expansion was a direct result of illegal activities.

161. Joesley and Wesley were also aware of the impact the revelation of their actions would have on the public and OTC markets. Therefore, Defendant and Joesley and Wesley were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate JBS' ADR price and minimize their losses through insider trading before the information of their actions was revealed to the investing public.

162. Accordingly, Joesley and Wesley had a considerable incentive to take steps to see that JBS' ADR price remained high as long as possible. It was only when JBS' corruption practices could no longer be concealed, that Defendant, Joesley, and Wesley came forward.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

163. During the Class Period, as detailed herein, Defendant engaged in a scheme to deceive the market and a course of conduct that artificially inflated JBS's ADRs price, and operated as a fraud or deceit on acquirers of JBS's ADRs. As detailed above, when the truth about JBS's misconduct and its lack of operational and financial controls was revealed, the value of JBS's ADRs declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in JBS's share price was a direct result of the nature and extent of Defendant's fraud finally being revealed to investors and the market. The timing and magnitude of the ADRs price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendant's fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendant's fraudulent scheme to artificially inflate JBS's stock price and the subsequent significant decline in the value of JBS's share, price when Defendant's prior misrepresentations and other fraudulent conduct was revealed.

164. At all relevant times, Defendant's materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of JBS's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendant publicly issued materially false and misleading statements and omitted material facts necessary to make Defendant's statements not false or misleading, causing JBS's ADRs to be artificially inflated. Plaintiff and other Class members purchased JBS's ADRs at those artificially inflated prices, causing them to suffer the damages complained of herein.

## VIII. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

165. At all relevant times, the market for JBS ADRs was an efficient market for the following reasons, among others:

(a) JBS ADRs met the requirements for listing, and were listed and actively traded on the OTC Market, a highly efficient market;

(b) During the Class Period, JBS ADRs were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, JBS filed with the SEC periodic public reports during the Class Period;

(d) JBS regularly communicated with public investors via established market communication mechanisms;

(e) JBS was followed by ADRs analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about JBS was rapidly reflected in and incorporated into JBS's stock price during the Class Period.

166. As a result of the foregoing, the market for JBS ADRs promptly digested current information regarding JBS from all publicly available sources and reflected such information in JBS's stock price. Under these circumstances, all purchasers of JBS ADRs during the Class Period suffered similar injury through their purchase of JBS's ADRs at artificially inflated prices, and a presumption of reliance applies.

167. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery

pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered JBS's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in JBS.

## IX. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

168. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

169. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

170. Defendant is also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of JBS who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendant were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendant expressly related to or stated to be dependent on

those historic or present-tense statements when made.

## X. CLASS ACTION ALLEGATIONS

171. Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired JBS ADRs on the public market during the Class Period, and were damaged, excluding Defendant, Joesley, Wesley, current and former officers and directors of JBS, and each of their immediate family members, legal representatives, heirs, successors or assigns as well as all of JBS's parents (including J&F Investimentos), affiliates, subsidiaries, successors, predecessors, and any entity in which JBS or any of its current or former officers (including Joesley and Wesley), directors, or employees has, or had, during the Class Period, a controlling interest (the "Class").

172. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JBS ADRs were actively traded on the OTC Market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in ADRs class actions.

173. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendant's wrongful conduct in violation of the federal laws complained of herein.

174. Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and ADRs litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

175. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal ADRs laws were violated by the Defendant's acts as alleged herein;

(b) whether the Defendant acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c) whether the price of JBS ADRs during the Class Period was artificially inflated because of the Defendant's conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

176. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIM FOR RELIEF

### COUNT I

### Violation of Section 10(b) and Rule 10b-5

177. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

178. During the Class Period, Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase JBS ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendant took the actions set forth herein.

179. Defendant violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of JBS's ADRs in an effort to maintain artificially high market prices for JBS ADRs.

180. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JBS's ADRs was artificially inflated during the Class Period. In ignorance of the fact that market prices of JBS's publicly-traded ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant, or upon the integrity of the market in which the ADRs trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class acquired JBS' ADRs during the Class Period at artificially high prices and were or will be damaged thereby

181. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of ADRs giving rise to the cause of action.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's

counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against Defendant for all damages sustained as a result of the Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: August 29, 2017

/s/ Nicholas Porritt

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:nporritt@zlk.com
Email:aapton@zlk.com